**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

No. 01-60254

---

SIERRA CLUB of Mississippi, Inc., a Mississippi non-
profit corporation; LOUIS MILLER, an individual;
DEBORAH J. DAWKINS, an individual

Plaintiffs-Appellants-Cross-Appellees

v.

CITY OF JACKSON, MISSISSIPPI, a Municipal Corporation

Defendant-Appellee-Cross-Appellant

---

Appeals from the United States District Court
for the Southern District of Mississippi

(3:98-CV-153-BN)

---

March 19, 2002

Before ALDISERT[*], DAVIS, and PARKER, Circuit Judges.

PER CURIAM:[**]

The Sierra Club of Mississippi, Louis J. Miller, Legislative

---

[*] Circuit Judge of the Third Circuit Court of Appeals,
sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.4.

1

Director of the Sierra Club of Mississippi and Deborah J. Dawkins, Chair of the Sierra Club of Mississippi ("Appellants") appeal from summary judgment entered in favor of the City of Jackson, Mississippi We must decide whether Appellants have standing to bring an action against the City of Jackson pursuant to 33 U.S.C. § 1365 and whether the district court abused its discretion in stating that City Attorney Terry Wallace failed to adequately supervise a subordinate attorney.

## I.

Appellants brought suit against the city alleging various violations of the Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 *et seq.* ("the Act"). Specifically, Appellants alleged that the city had violated the parameters of certain National Pollutant Discharge Elimination System ("NPDES") permits issued to it by the Mississippi Department of Environmental Quality ("MDEQ"). These permits impose limitations on the discharge of pollutants from three wastewater treatment facilities operated by The city.

The Jackson sits atop a watershed, the east side of which drains into the Pearl River and the west side of which drains into the Bogue Chitto Creek, a tributary of the Black River. The city operates three wastewater treatment facilities which discharge into these two separate waterways. The Savannah Wastewater Treatment Facility and the Trahon Wastewater Treatment

2

Facility discharge effluent into the Pearl River while the Presidential Hills Subdivision Wastewater Treatment Facility empties into Bogue Chitto Creek. The MDEQ has issued a NPDES permit to each of these facilities pursuant to Mississippi's state environmental program authorized by the Environmental Protection Agency ("EPA").

Wastewater is conveyed to each of these treatment facilities through a system of gravity collection lines, lift stations and force mains. This overall collection system covers an area which drains approximately 115 square miles. Between January 28, 1995, and December 1, 1997, The city reported to the Mississippi Office of Pollution Control thirty-two spills of raw sewage from various points in its sewage collection system. Record at 1-87.

Appellants subsequently filed their complaint in the district court on February 24, 1998, relying on the thirty-two reports to the Mississippi Office of Pollution Control and claim that they are citations from MDEQ evidencing that the city has violated the NPDES permit limitations for its three wastewater treatment facilities.

On February 18, 2000, the parties informed the court that they had reached a settlement agreement that would resolve the case. The district court then issued an order stating that the court would dismiss the lawsuit if the parties did not consummate the settlement by May 1, 2000. During the interim period, settlement negotiations broke down and Appellants filed a Motion

to Enforce Settlement on March 29, 2000. On May 5, 2000 the district court ordered an evidentiary hearing on the Motion to Enforce Settlement and further required Attorneys for The city to show cause why they should not be sanctioned pursuant to Rule 16(f) of the Federal Rules of Civil Procedure for making a representation to the district court that a settlement negotiation had been reached, when in fact counsel had not received approval concerning the terms of the settlement from their client.

Subsequently, on September 28, 2000, the court denied Appellants' Motion to Enforce Settlement because the agreement had not been lawfully approved by the City of Jackson. Furthermore, the court sanctioned Deputy City Attorney Terry Williamson under Rule 16(f). The court concluded that City Attorney Terry Wallace was not liable for sanctions because he was merely acting in a supervisory capacity. However, the court made a statement that Mr. Wallace's supervision was "obviously . . . inadequate." Record at 519.

The court granted summary judgment in favor of the city, determining that Appellants did not have standing to bring this action. In addition, the court denied the city's Motion to Seal Records.

Following the final disposition of the merits of the action, City Attorney Terry Wallace sought to expunge any references to him.

4

The Sierra Club filed their Notice of Appeal on March 13, 2001. Record at 823-824. On April 30, 2001, City Attorney Terry Wallace filed his Notice of Appeal from the March 30, 2001, order denying both of his post judgment motions.

## II.

The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" with the goal "that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. §§ 1251(a), (a)(1). The citizen suit provision of the Act provides for the type of enforcement action brought by Appellants in this case. "As private attorneys general, citizens constitute a special category of plaintiffs who ensure that [municipalities] comply with the Act even when the government's limited resources prevent it from bringing an enforcement action." Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc., 2 F.3d 493, 503 (3d Cir. 1993) (citing Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1136 (11th Cir. 1990)). However, the Act only confers standing on plaintiffs in these cases to the "limits of the Constitution." Save Our Community v. EPA, 971 F.2d 1155, 1160 n.10 (5th Cir. 1992). On appeal, we "review a district court's holding on the issue of standing de novo." Sierra Club v. Cedar Point Oil Co., Inc., 73 F.3d 546, 555 (5th Cir. 1996) (citing MD II

5

Entertainment, Inc. v. City of Dallas, 28 F.3d 492, 497 (5th Cir. 1994); United States v. $38,570 U.S. Currency, 950 F.2d 1108, 1111 (5th Cir. 1992)).

The Court has determined:

An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.

Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc., 528 U.S. 167, 181 (2000) (citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). The city does not contest Appellants' assertion that the interests they seek to protect are germane to the purpose of the Sierra Club, or that the participation of the individual members of the Sierra Club is not necessary. Instead, the city argues that none of the members of the Sierra Club have standing to sue in their own right.

The Court has set forth three requirements for an individual to satisfy Article III standing.

[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc., 528 U.S. 167, 180-181 (2000) (citing Lujan v. Defenders of Wildlife,

6

504 U.S. 555, 560-561 (1992)).

A.

First, Appellants assert that some of the club members are riparian land owners along the Pearl River and its tributaries, and that their property has been "adversely affected by the discharge of pollutants."  Appellants' Brief at 16.  However, Appellants have presented no evidence that any of its members actually live on the Pearl River or the Bogue Chitto Creek or that their property has suffered any damage.  As the district court determined below:

> The only statement that remotely concerns where members of the Sierra Club own land is as follows:  "The Sierra Club of Mississippi is a nonprofit Mississippi Corporation with over 1,000 members, most of whom live in the metropolitan Jackson area near the Pearl River and its environs."  Nothing in this statement . . . specifically asserts that any of the members of the Sierra Club actually owns property that is located on the Pearl River.  Even if certain members do own such property, nowhere in the Affidavit [do Appellants] allege that such land owners have suffered damage as a result of any pollutant.  Accordingly, the court finds that this Affidavit does not establish a genuine issue of material fact as to whether members of the Sierra Club own property along the Pearl, and whether such property has suffered from the effects of pollution by the City.

Sierra Club of Mississippi v. City of Jackson, No. 3:98-CV-153BN, slip op. at 8-9 (S.D. Miss. Feb. 18, 2001) (internal citations omitted).

In addition, Appellants contend that another class of its members has sustained injury of a "recreational" and "aesthetic"

7

nature.  They argue that certain members "who would otherwise enjoy various activities in, on and along the river such as canoeing, fishing, hiking, camping, hunting, and nature studies are unable to do so because of the river's current condition." Appellants' Brief at 16.  As Appellants correctly point out, "harm to aesthetic and recreational interests is sufficient to confer standing . . . These injuries need not be large, an 'identifiable trifle' will suffice."  Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990) (citing Sierra Club, 405 U.S. at 735; United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973)).  Although admittedly recreational and aesthetic interests are enough to pass constitutional standing muster, the Court has said that "[t]he relevant showing . . . is not injury to the environment but injury to the plaintiff."  Friends of the Earth, Inc., 528 U.S. at 181.  Here is where Appellants fall short.

In Sierra Club v. Cedar Point Oil Co., Inc., 73 F.3d 546 (5th Cir. 1996), this court determined that members of the Sierra Club's Lone Star Chapter had standing to bring suit to enjoin the discharge of "produced water" into Galveston Bay.  In finding that the members had standing, this court concluded that their concern that the discharge of produced water would hinder their ability to engage in certain recreational activity was sufficient

"injury in fact." Id. at 556-557. However, vital to the court's decision was the fact that all of the group members **actually used the specific area** of Galveston Bay subject to the discharge for recreational activity.

Similarly, in Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp., 95 F.3d 358 (5th Cir. 1996), we considered whether an organization whose membership included individuals who birdwatch some 18 miles and three tributaries from the source of an unlawful discharge had standing to sue to for violations of the Act. In finding a lack of standing, this court found determinative that no members used the waterway into which pollutants were being discharged. Id.

In the case at bar, the only two examples of recreational or aesthetic harm to individual members of the Sierra Club comes in the form of testimony from Appellants Miller and Dawkins. Appellant Miller asserts that he "has for some time enjoyed recreations [sic] activities upon and near the Pearl River and its environs." Record at 553. However, Miller testified that he fishes, boats and camps on an area of the Pearl River located in Madison County, well north and **upstream** of Jackson, Mississippi. Record at 330-332. This is an area that physically could not be affected by the discharges from The city's treatment facilities. Similarly, Dawkins argues that she "has for some time enjoyed recreational activities upon and near the Pearl River and its

9

environs." Record at 553. However, Dawkins testified in her deposition that the last time she used Pearl River was in 1985. Record at 323. Such examples of harm are too remote to fulfill the "injury in fact" requirement for standing purposes.

B.

In addition to demonstrating an "injury in fact," to have standing to bring an action under 33 U.S.C. § 1365, Appellants must show that any injury suffered by its individual members is "fairly traceable" to The city's unlawful conduct. In their attempt to link their members' alleged injury to The city's conduct, Appellants rely on a three-prong test espoused by the Court of Appeals for the Third Circuit, and later adopted by this court.

> [T]he plaintiff must demonstrate that "a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs."

Friends of the Earth, Inc., 95 F.3d at 360-361 (citing Powell Duffryn, 913 F.2d at 72).

In Friends of the Earth, Inc., this court considered whether an organization whose membership included individuals who birdwatch some 18 miles and three tributaries from the source of an unlawful discharge had standing to sue to for violations of the Act. In determining that any alleged injury to plaintiffs

10

could not be linked to conduct of the defendant, we considered that no plaintiff utilized the body of water where the alleged discharge occurred.

> [M]embers use a body of water located three tributaries and 18 miles "downstream" from La Gloria's refinery. Assuming without deciding that Lake Palestine is part of the same "waterway" as Black Fork Creek for purposes of the <u>Powell Duffryn</u> test, that "waterway" is too large to infer causation solely from the use of some portion of it.

*　*　*　*　*

> We do not impose a mileage or tributary limit for plaintiffs proceeding under the citizen suit provision of the CWA. To the contrary, plaintiffs who use "waterways" far downstream from the source of unlawful pollution may satisfy the "fairly traceable" element by relying on alternative types of evidence. For example, plaintiffs may produce water samples showing the presence of a pollutant of the type discharged by the defendant upstream or rely on expert testimony suggesting that pollution upstream contributes to a perceivable effect in the water that the plaintiffs use.

<u>Friends of the Earth, Inc.</u>, 95 F.3d at 361-362 (internal citations omitted).

Appellants here are unable to show a sufficient nexus between any injury to individual members and the city's conduct. None of the Appellants have indicated that they use the portion of the waterway allegedly affected by the discharge of pollutants. In addition, and possibly more important, however, Appellants have made no indication that a single discharge from the city's facilities has actually reached any waterway. The city has presented testimony from the Acting Division Manager of

11

the Water/Sewer Utilities Division and the Regional Waste Water Treatment Manager that each of the thirty-two discharges occurred in the collection system leading to the treatment facilities and not at the facilities themselves.  Accordingly, they maintain that none of the pollutants were released into any waterway, but instead were absorbed by the ground where the leaks occurred. This evidence was accepted by the district court and was not contradicted by Appellants.  <u>Sierra Club of Mississippi v. City of Jackson</u>, No. 3:98-CV-153BN, slip op. at 14-16 (S.D. Miss. Feb. 18, 2001).

Consequently, we hold that the court did not err in deciding that Appellants also failed to meet the "fairly Traceable" requirement of standing.

III.

Because we determine that Appellants in this case lack standing to bring suit under 33 U.S.C. § 1365, we need not determine whether Appellants had failed to establish a violation of the Act or whether The city was entitled to summary judgment concerning the affirmative defense of upset.

IV.

The court also determined that City Attorney Terry Wallace was not liable for sanctions because he was merely acting in a supervisory capacity, but did go on to state that Mr. Wallace's supervision was "obviously . . . inadequate."  Record at 519. Mr. Wallace contests this determination by the district court and

seeks to have the relevant language expunged.

We appreciate the frustration, annoyance and irritation that the district court experienced when informed by the Deputy City Attorney that the city had approved the settlement when in fact it had not. There is no question that the deputy deserved the sanctions imposed. But as regards City Attorney Wallace, an independent review of the record troubles us. What we know as men and women we must not forget as judges. We know several things about the office of City Attorney of any major city. He or she is both a lawyer and an administrator. Moreover, the office is often a stepping stone to other government positions that involve supervision. Thus, the reference to Wallace's supervision as "obviously . . .inadequate" is a major smear or blemish on his escutcheon that must not be treated lightly. It is an evaluation of his administrative skills in government service that may far exceed the imposition of sanctions. Without belaboring the point, we simply say this. The district court made reference to a lack of supervision in three separate orders. However justified the court may have felt "smelling the smoke of battle" to make such a statement, the possible far reaching consequences are such that this kind of statement should have been made only after affording the City Attorney notice that his supervisory skills were to be called into question, a record made, facts found, and conclusions drawn therefrom. We believe that it is not a permissible inference, let alone a compellable

13

one, that a dereliction of a subordinate has been caused by lack of supervision by the highest authority in the office. To hold otherwise is to commit what the logicians call either the informal fallacy of hasty generalization or the more familiar fallacy of <u>post</u> <u>hoc</u> <u>propter</u> <u>hoc</u>. Accordingly, while understanding actions by the distinguished district judge, we believe that it is necessary to expunge this evaluation of the City Attorney's supervisory skills from the record.

*    *    *    *    *

We therefore conclude that Appellants in this case lack standing to bring an action under 33 U.S.C. § 1365. In this respect the judgment of the district court is **affirmed**. We **remand** these proceedings, however, to the district court to **expunge** the district court's statements relating to City Attorney Wallace, described above, wherever they appear in the record.

14