**FRIENDS OF THE EARTH,
INC., Plaintiff,**

v.

**CHEVRON CHEMICAL COMPANY,
Defendant.**

**Nos. 1:94CV434, 1:94CV580.**

United States District Court,
E.D. Texas,
Beaumont Division.

Sept. 1, 1995.

Bruce J. Terris, Carolyn Smith Pravlik and Steven J. Santarsiero, of Terris, Pravlik and Wagner, Washington, DC, for Plaintiff.

James E. Smith of Beirner, Maynard & Parsons, LLP, Houston TX and Michael Smith of Chevron Chemical Co., Houston, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS MOTION TO DISMISS ON THE GROUND OF MOOTNESS, AND DENYING PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

SCHELL, Chief Judge.

This case is before the court on cross-motions for summary judgment. "Chevron's Motion for Summary Judgment or, in the Alternative, for Dismissal on the Ground of Mootness" was filed on February 15, 1995. Plaintiff filed its response on March 17, 1995. Subsequently, Chevron filed a reply on April 17, 1995. "Plaintiff's Motion for Partial Summary Judgment" was filed on February 16, 1995. The respective parties also filed a response on March 17 and a reply on April 17 to this particular motion followed by Plaintiff's supplemental brief on August 15, 1995. Upon consideration of the motions, responses, replies, exhibits, affidavits and accompanying memoranda of law, this court is of the opinion that Defendant's motion should be GRANTED in part and DENIED in part. Additionally, the court is of the opinion that Plaintiff's motion should be DENIED.

## I. FACTS

On July 18, 1994, Plaintiff filed this private civil enforcement action against Chevron Chemical Company pursuant to Section 505 of the Federal Water Pollution Control Act (also known as the Clean Water Act or the "CWA"). 33 U.S.C.S. § 1365. Subsequent to filing suit, Plaintiff discovered additional alleged violations of Defendant's permit and filed a second suit. On December 20, 1994, this court consolidated the two actions.

Under the provisions of the CWA, on August 16, 1986, Defendant received a National Pollutant Discharge Elimination System ("NPDES") permit from the E.P.A. for its polyethylene plant located in Orange, Texas. This permit authorized Defendant to discharge limited quantities of certain pollutants into the "Round Bunch Gully, thence to Cow Bayou, and thence to the Sabine River," and thence into Sabine Lake. This permit was revised and renewed on September 29, 1989, and then again on May 1, 1994.

Plaintiff alleges that Defendant has violated several parameters of these permits and claims that it is entitled to prosecute this case as a private attorney general under the CWA. Plaintiff brings this action on behalf of five of its members who have allegedly suffered harm from Defendant's permit viola-

tions. Specifically, Plaintiff complains of exceedances of Biochemical Oxygen Demand ("BOD"), Chemical Oxygen Demand ("COD"), pH level, Total Suspended Solids ("TSS"), Copper, Zinc and Temperature limitations and of a single monitoring violation. For these exceedances, Plaintiff seeks a declaratory judgment, injunctive relief, civil penalties, and costs. Furthermore, Plaintiff has filed a motion for summary judgment on the issue of Defendant's liability for its alleged permit violations.

Defendant seeks summary judgment on the grounds that there is no evidence that Defendant is "in violation" of its NPDES permit as that term has been judicially construed, and that there is no evidence that Plaintiff or any of its members have both constitutional and statutory standing to bring this citizen suit. In the alternative, Defendant asserts that Plaintiff's claims should be dismissed as moot.

Defendant contends further that Plaintiff did not provide sufficient notice to pursue its temperature exceedance claims, and that Defendant did not violate its copper and zinc parameters.

## II. MOTION TO DISMISS FOR MOOTNESS

■ Defendant requests this court to dismiss Plaintiff's action because it is moot. Under some circumstances, a suit may be dismissed when " 'there is no reasonable expectation that the wrong will be repeated.' " *United States v. W.T. Grant Co.,* 345 U.S. 629, 631, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (quoting *United States v. Aluminum Co. of America,* 148 F.2d 416, 448 (2nd Cir. 1945)). It must be noted that "[i]n seeking to have [this] case dismissed as moot, however, the defendant's burden 'is a heavy one.' " *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 631, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). In satisfying this burden, "[t]he defendant must demonstrate that it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Gwaltney I,* 484 U.S. at 66, 108 S.Ct. at 386 (quoting *United States v. Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 202, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)).

The doctrine of mootness has been applied to citizen suits under the Clean Water Act. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987). The Fifth Circuit stated that "[a] suit may be dismissed because the defendant complies with the Act *subsequent to the complaint* if the defendant's compliance moots the action." *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1065 (5th Cir.1991). Normally, a citizen suit will include a request for injunctive relief and a request for civil penalties. Clearly, if a defendant can prove that no further permit violations could reasonably be expected to recur, a plaintiff's claim for injunctive relief would be mooted. *See Id.; Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.,* 2 F.3d 493, 502 (3rd Cir.1993); *Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.,* 993 F.2d 1017, 1020 (2nd Cir. 1993).

Defendant contends that Plaintiff's claim for injunctive relief is moot. In its complaint, Plaintiff alleges that Defendant is in violation of several NPDES parameters. Particularly, Plaintiff complains of biochemical oxygen demand (BOD), chemical oxygen demand (COD), acidity/alkalinity (pH) and total suspended solids (TSS) violations. *Plaintiff's Complaint,* 1:94cv434, Exhibit A. In addition, Plaintiff complains of temperature violations.[1] *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, or, in the Alternative, for Dismissal on the Ground of Mootness,* Exhibit 2. The majority of Defendant's permit violations consist of TSS exceedances. In fact, Plaintiff alleges that Defendant exceeded its TSS ceilings on 62 occasions between December of 1989 and January of 1994. The complaint also cites 3 pH exceedances; however, the last pH violation occurred in September of 1991. BOD and COD exceedances provide

---

1. The court does not consider the alleged Copper and Zinc exceedances because of Defendant's

motion for summary judgment. *See infra* part III.B.

the remaining balance of permit violations. Defendant allegedly had 17 combined COD and BOD violations. Most of the BOD and COD exceedances occurred before January of 1992. After that date, only one BOD exceedance was recorded and no COD exceedances occurred. Finally, Plaintiff states that four temperature violations occurred during August of 1994. *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, or, in the Alternative, for Dismissal on the Ground of Mootness,* Exhibit 2.

In response, Defendant argues that the record illustrates and makes it *absolutely clear* that its past NPDES violations could not reasonably be expected to recur. Defendant claims that no further NPDES permit violations will occur because of the issuance of a more lenient NPDES permit,[2] the operation of a new wastewater treatment system and the operation of other interim/permanent control measures.[3] Because of these measures, Defendant claims that BOD,[4] COD, pH, TSS and temperature[5] exceedances are not reasonably likely to occur in the future. In support of its motion for summary judgment, Defendant proffered the affidavit of Lial F. Tischler, an expert in water quality control. *Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit D. In this affidavit, Dr. Tischler explains the interim measures and the new wastewater treatment system that Chevron implemented to comply with its NPDES permits. Further, Dr. Tischler states that these measures make it "absolutely certain that recurring violations are not reasonably likely to occur."[6] *Id.* at 10. As additional support,

2. The new permit which became effective on May 1, 1994 significantly expanded the exceedance limitations for BOD, COD and TSS. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability,* Exhibits 2–3 (Page 2 of Part II, respectively).

3. Defendant implemented several control measures to meet its NPDES permit requirements. These measures included: increased inspection of Defendant's filtomats, increased control of polyethylene fluff, installation of hay bales in stormwater ditches, daily inspections of mud pond pumps, increased operation of bucket conveyors, use of soil covers and filter fences, installation of shrouds and increased stormwater surge capacity. *Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit C at 2.

4. Defendant's Engineer and Maintenance Manager of the Chevron Chemical Orange Plant, Terry Cunningham, stated,

Regarding BOD, the last exceedance of the old permit occurred in March 1994. For that month, the monthly average BOD discharge was slightly above the permitted limit. However, the new permit, effective in May 1994, contains a higher BOD limit and the March discharge would have been within the limits of the new permit. Further, the Chevron Orange plant identified a plugged sludge return line as the most likely cause of the BOD exceedance. This line was repaired in April and its operation is verified twice daily. BOD discharge levels quickly dropped to below pre-March 1994 levels and have since been well within the current permit.

*Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit C at 2.

5. Defendant argues that these four temperature exceedances amount to nothing more than an isolated occurrence which will not be repeated.

Chevron acknowledges a short-term operational incident resulting in 4 temperature exceedances in August 1994. Such exceedances have never happened before or since. The reported value was 106°F, only 1°F above the limit of 105°F. The precision of the instrumentation is 2.8°F, indicating that the actual water temperature may have been within the limit. Chevron has since corrected the equipment problem that caused the high temperature and it is absolutely clear that no temperature exceedance is reasonably likely in the future.

*Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit C at 1 n. 1.

6. More particularly, Dr. Tischler opined,

The interim wastewater management procedures that were implemented by July 1, 1994 were sufficient to insure that the past NPDES permit exceedances would not recur on either an ongoing or an intermittent basis....

The interim measures were also intended to insure compliance with the BOD and COD limitations. The absence of any exceedances of these limits during the period from July 1, 1994 to date demonstrates that these measures were effective.

I am familiar with the design of the current wastewater treatment system and am confident that it will assure compliance with all permit limits and conditions. It is absolutely certain that recurring violations are not reasonably likely to occur.

Defendant proffered the affidavit of Dale W. Durr, its Environmental Superintendent, who concurs with Dr. Tischler's conclusions. *Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit B. In evaluating Defendant's system, both Durr and Tischler opine that Defendant's permit violations could not reasonably be expected to recur given the Orange plant's current status. *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment,* Exhibits A & B.

In response, Plaintiff submits a number of exhibits, including the affidavit of Dr. Bruce A. Bell, a civil and environmental engineer. In his affidavit, which focuses in specific terms on the likelihood of continued TSS permit violations, Dr. Bell concludes that "[b]ased on historical rainfall and the calculations done by Chevron's consultant, it is my opinion that ongoing violations of TSS limits were likely on July 18, 1994." Dr. Bell states that there was a "reasonable likelihood" as of July 18, 1995, that Chevron would violate its TSS effluent limitations in the event of a single rainfall of 2 inches or more. *Plaintiff's Brief In Opposition To Defendant's Motion for Summary Judgment, Or, In The Alternative, For Dismissal On The Ground Of Mootness,* Exhibit 18.

Given this conflicting evidence, the court concludes that the Defendant has not demonstrated that it is "absolutely clear" that additional TSS permit violations could not reasonably be expected to recur. Therefore, Plaintiff's claim for injunctive relief is not moot.

## III. SUMMARY JUDGMENT

In this case, both the defendant and plaintiff have moved for summary judgment. Federal Rule of Civil Procedure 56(c) states that a summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." For some of the issues upon which the par-

ties move for summary judgment, the movant has the burden of proof, and for others, the nonmovant holds the burden of proof. The court will address these issues accordingly under the following standards.

When the movant has the burden of proof, the movant must prove that he is entitled to a judgment as a matter of law. In making this determination, "[f]act questions must be considered with deference to the nonmovant," and all inferences should be drawn in favor of the nonmovant. *Sterling Property Mgmt., Inc. v. Texas Commerce Bank,* 32 F.3d 964, 966 (5th Cir.1994).

A similar analysis may be utilized when the nonmovant has the burden of proof. A summary judgment movant may discharge its burden by showing to the court that there is an absence of evidence on an element of the nonmovant's case which is both essential and in regard to which the nonmovant bears the burden of persuasion. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553. When summary judgment is sought on this basis, the burden shifts to the nonmovant "to make a showing sufficient to establish the existence of [the] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2552. In making a sufficient showing, a non-movant may neither rest upon the pleadings nor argue in the abstract that the legal theory involved in the case encompasses some factual questions. *Pennington v. Vistron Corp.,* 876 F.2d 414, 426 (5th Cir.1989); rather, a nonmovant must "set forth specific facts establishing a necessary and genuine issue." FED.R.CIV.P. 56(e). And when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, the nonmovant has failed to establish a genuine issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Hence, when a nonmovant cannot establish a genuine issue as to an essential element of the claim, summary judgment is proper because "[t]here can be no genuine issue as to any material fact, since a complete

*Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to*

*Dismiss for Mootness,* Exhibit D at 9–10.

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 321, 106 S.Ct. at 2552.

### A. Constitutional Standing

■ Defendant contends that this action should be dismissed because it is not justiciable. Particularly, Defendant argues that Plaintiff lacks constitutional standing to bring this suit. The constitutional standing requirement derives from the case or controversy provision of Article III of the Constitution. U.S. CONST. art. III, § 2. This requirement "focuses upon '[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy.'" *Save Our Community v. United States Environmental Protection Agency,* 971 F.2d 1155, 1160 (5th Cir. 1992) (per curiam) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 730, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972)). In deciding whether Plaintiff has standing in this case, the court relies upon the analysis found in *Save Our Community.* For an organization, such as Friends of the Earth, to bring suit on behalf of its members, three requirements must be satisfied: "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 1160 (quoting *O'Hair v. White,* 675 F.2d 680, 691 (5th Cir.1982) (en banc)).

■ Defendant argues that Plaintiff cannot satisfy the first requirement because its members do not have standing to sue Defendant on their own behalf. For an individual to have standing, that individual must "'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). This threshold may be broken into three basic components: (1) did the plaintiff suffer some actual or threatened injury, (2) is this injury fairly traceable to the defendant's activity, and (3) are plaintiff's injuries likely to be redressed by a favorable decision? *See Save Our Community,* 971 F.2d at 1160–61.

#### 1. *Actual or Threatened Injury*

■ In deciding whether a plaintiff in fact suffered an injury, the "'injuries need not be large, an "identifiable trifle" will suffice.'" *Id.* at 1161 (quoting *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 71 (3rd Cir. 1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991)). This requirement establishes a relatively low threshold. *Id.* "[H]arm to aesthetic, environmental, or recreational interests is sufficient to confer standing, provided that the party seeking review is among the injured." *Save Our Community,* 971 F.2d at 1161 (citing *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)).

In *Save Our Community,* the plaintiff sought to prohibit the draining of several ponds on behalf of its members. To satisfy the injury component of the standing analysis, the plaintiff asserted that "its members resided in the vicinity of or owned property near the wetlands on the Skyline Landfill, and enjoyed 'the wildlife, aesthetics, open space, ecological and other values of the wetlands, ... and [were] directly and beneficially interested in the continued protection, preservation, and enhancement of these values.'" *Save Our Community,* 971 F.2d at 1160–61. These interests were deemed sufficient to satisfy the injury requirement.

■ In the case at bar, Plaintiff asserts similar injuries to those of the plaintiff in *Save Our Community.* Plaintiff proffered the affidavits of Opal Fruge, Margaret Green, Rodolfo Holz, Richard Payne and Rodney Crowl; all five individuals are members of the Friends of the Earth organization. The affidavits complain of pollution in Sabine Lake and the Gulf of Mexico. *Plaintiff's Motion for Partial Summary Judgment,* Exhibits 8–12. Particularly, the affi-

ants complain of diminished recreational activity, diminished aesthetic beauty and pollution-contaminated seafood. As the Supreme Court held in *Sierra Club v. Morton,* harm to aesthetic, environmental or recreational interests will suffice to create standing, and these injuries asserted by affiants cross the necessary threshold. *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

### 2. *Fairly Traceable*

■ Defendant also contends that the affiants' alleged injuries are not fairly traceable to Defendant's permit violations. In support of its contention, Defendant proffered the affidavit of Dr. Tischler. Dr. Tischler opines, "I do not believe the water quality of Sabine Lake is such that any of [Plaintiff's affiants'] statements has merit. Moreover, it is absolutely clear from my studies that the Chevron discharge could have no measurable or observable effect on the water quality of Sabine Lake.... Chevron's maximum effluent discharge is 0.17% of the flow into Sabine Lake.... The exceedingly small contribution of Chevron's effluent to the inflow of Sabine Lake makes it clear that this discharge has no measurable or observable impacts on water quality in Sabine Lake." *Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit D, pp. 6–7.

"[T]he 'fairly traceable' element does not require that the plaintiffs 'show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs.'" *Save Our Community,* 971 F.2d at 1161. Rather, "plaintiffs need only show that there is a 'substantial likelihood' that defendant's conduct caused plaintiff's harm." *Powell Duffryn Terminals, Inc.,* 913 F.2d at 72. In deciding this factor, the Third Circuit enunciated a three prong test. This test requires a showing that the defendant has "1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant

causes or contributes to the kinds of injuries alleged by the plaintiffs." *Powell Duffryn Terminals, Inc.,* 913 F.2d at 72 (cited favorably in *Save Our Community,* 971 F.2d at 1161).

#### a. Discharge exceedance

In the case at bar, under the first prong, there is strong evidence indicating that Defendant has discharged pollutants in concentrations greater than allowed by its permit. Defendant had exceedances in TSS, COD, BOD, pH and temperature.

#### b. Interest which may be adversely affected

Defendant vehemently contests the second prong and contends that their outflow does not discharge into a waterway in which Plaintiff has an interest that is or may be adversely affected by Defendant's outflow. Plaintiff's members, in their affidavits, complain of pollution in Sabine Lake and the Gulf of Mexico. It is true that Defendant does not discharge directly into Sabine Lake; rather, Defendant's discharge flows into Round Bunch Gully, into Cow Bayou, into the Sabine River, which empties into Sabine Lake and the Gulf of Mexico. *Brief in Support of Chevron's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss for Mootness,* Exhibit E, Page 1 of Part I. While there are intermediary bodies of water between Defendant's plant and Sabine Lake, Defendant's discharge will eventually spill into Sabine Lake. The distance between the Orange plant and Sabine Lake is somewhere between two and four miles. *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment,* Exhibit C. The distance between these two points is not so great and the interaction is not so tenuous that this court cannot find that Plaintiff's interest in Sabine Lake will be unaffected by Defendant's pollutant exceedances.

#### c. Possible cause of alleged injuries

Finally, under the third prong, Defendant argues that the injuries alleged by the affiants were not caused by Defendant's discharge. However, under the *Powell Duffryn Terminals, Inc.* test, Plaintiff need only show that Defendant's type of exceedances "cause

or contribute to the kinds of injuries alleged by the plaintiffs." *Powell Duffryn Terminals, Inc.*, 913 F.2d at 72. In her affidavit, Opal Fruge complains that Sabine Lake appears polluted and states that she has refrained from recreating on the lake because it is polluted. *Plaintiff's Motion for Partial Summary Judgment*, Exhibit 8. Further, Ms. Fruge claims that she would boat on the lake if it was cleaner. *Id.* TSS can lead to turbidity, a dirty appearance and diminished recreational value in a body of water. *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, for Dismissal on the Ground of Mootness*, Exhibit 6. Hence, Defendant's TSS exceedances could cause or contribute to the kinds of injuries alleged by the Plaintiff's members.

Although Defendant's permit contained limits on the amount of TSS that Defendant could discharge, Defendant exceeded these limitations. In exceeding its permit, Defendant discharged TSS which eventually found its way into Sabine Lake. Furthermore, TSS can cause or contribute to the polluted appearance of Sabine Lake. Thus, some of the injuries suffered by Plaintiff's members may fairly be traced to Defendant's discharge. *See Powell Duffryn Terminals, Inc.*, 913 F.2d at 73–74.

### 3. *Redressability*

▮ The final requirement demands that Plaintiff's injuries are "likely to be redressed by a favorable decision." *Valley Forge Christian College*, 454 U.S. at 471, 102 S.Ct. at 758. "The redressability factor focuses upon the connection between the plaintiff's injury and the judicial relief sought." *Save Our Community*, 971 F.2d at 1161. Although a plaintiff may ultimately only be awarded civil penalties and those penalties will be paid into the United States Treasury, such an award will satisfy the redressability requirement. "Where Congress has expressly granted a right of action and plaintiffs have shown 'a distinct and palpable injury,' plaintiffs 'may invoke the general public interest in support of their claim.' The general public interest in clean waterways will be served in this case by the deterrent effect of an award of civil penalties." *Powell Duffryn*

*Terminals, Inc.*, 913 F.2d at 73; *cf. Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 694 (4th Cir. 1989). Thus, since Plaintiff seeks civil penalties, Plaintiff's injuries are likely to be redressed by a favorable decision in this action.

Given the facts of this case, Plaintiff's affiants clearly would have constitutional standing to pursue this action. They satisfy all three components of the *Valley Forge Christian College* test. Therefore, the court finds that Plaintiff also has constitutional standing to pursue this citizen's suit.

### B. Notice

▮ Defendant contends that Plaintiff's claim for civil penalties for its temperature exceedances should be dismissed for insufficiency of notice. Section 1365 provides that a citizen suit may not be brought "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order...." 33 U.S.C. § 1365(b)(1)(A). This type of provision is jurisdictional and mandatory. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989); *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1189 n. 15 (3rd Cir.1995). The objective of the notice requirement is two-fold. "First, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits." *Hallstrom*, 493 U.S. at 28, 110 S.Ct. at 310; *Public Interest Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1246 (3rd Cir.1995). "Second, notice gives the alleged violator 'an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'" *Hallstrom*, 493 U.S. at 28, 110 S.Ct. at 310; *Hercules, Inc.*, 50 F.3d at 1246.

▮ In Section 1365(b), Congress delegated to the E.P.A. the duty to prescribe notice requirements. Pursuant to that delegation, the E.P.A. requires that a notice letter

include sufficient information to permit the recipient to identify the specific standard,

limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). The use of the general term "sufficient information" has left the notice requirement open for interpretation. In a similar citizen suit brought under the Clean Air Act, the Eighth Circuit strictly applied the notice requirement and refused to consider violations which were not explicitly included in the plaintiff's notice letter. *Save Our Health Organization v. Recomp of Minnesota, Inc.*, 37 F.3d 1334, 1337 (8th Cir.1994) (relying upon a similar definition of notice in 40 C.F.R. § 54.3(b)). Conversely, in another case, the district court reviewed violations that had not been properly noticed under Section 1365(b) because "the defendant and the regulatory agencies involved had actual notice for more than sixty days." *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 652 F.Supp. 620, 628 (D.Md.1987).

While several benefits are achieved by strictly applying Section 1365's notice requirement, a strict application can also have some undesirable side-effects. Clearly, notice is necessary to encourage the E.P.A. to administratively prosecute any NPDES violations and to encourage an entity to voluntarily remedy the cause of its permit exceedances. These goals cannot be attained if the EPA and permittee are not notified about the violation, the relevant permit, the outflow location and violation date. Nevertheless, a strict application of the notice requirement can be procedurally unwieldy for litigants and courts. For instance, a strict application of the notice requirement would require a plaintiff to send an additional notice to the EPA, state administrator and permittee for every subsequent permit violation occurring after the suit was filed. Then after 60 days, the plaintiff either would have to file another suit and consolidate it with the original suit or seek to amend its original complaint to add the additional claims. When a defendant continues to exceed its permit on numerous occasions, such a re-

quirement will be burdensome upon both the parties and the court. Hence, in applying the notice requirement, these polar interests must be considered and balanced.

The Third Circuit has proposed and applied an effective solution to this issue. In *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3rd Cir.1995), the court interpreted Section 135.3(a) to require "that the citizen provide enough information to enable the recipient . . . to identify the specific effluent discharge limitation which has been violated, including the parameter violated, the date of the violation, the outfall at which it occurred, and the person or persons involved." In giving notice, a plaintiff need not give notice "of each individual violation of a specific discharge limitation;" rather, a citizen is only required to identify "discharges in excess of the effluent limit" and illuminate the parameters that have been exceeded. *Id.* This interpretation provides a practical solution for handling post-complaint exceedances. "[A]s long as a post-complaint discharge violation is of the same type as a violation included in the notice letter (same parameter, same outfall), no new 60–day notice letter is necessary to include these violations in the suit." *Id.* at 1250. However, for post-complaint violations of a particular parameter and/or outflow that have not been previously noticed, a plaintiff must provide notice under Section 1365(b). *Id.* at 1251.

When post-complaint exceedances are of the same parameter as those exceedances detailed in the initial notice, the initial notice provides a permittee and the EPA with sufficient notice of the plaintiff's intent to sue and of the pollution problem. If these entities are alerted to a particular problem for a particular parameter, they have the ability to discover all other past and future violations through the violator's Discharge Monitoring Reports ("DMRs"). *Id.* Such notice is sufficient to provide the EPA and state enforcement agencies with enough information to pursue an administrative action and to identify a problem area for the violator. However, when the initial notice does not complain of exceedances for a particular

parameter and the post-complaint exceedance is within the previously unnoticed parameter, the initial notice will not suffice. A plaintiff must give notice for violations of a new parameter. Many companies have several NPDES permits, several outflows and scores of parameters that are monitored. At a minimum, under Section 1365(b) and Section 135.3(a), the separate parameter, for which relief is sought, must be identified. In order to seek relief for a parameter exceedance, the particular parameter must be identified somewhere in some notice letter.[7] *See Hercules, Inc.,* 50 F.3d at 1249.

■■■■ This consolidated action includes two notice letters submitted to Defendant, the E.P.A. and the Texas Natural Resource Conservation Commission. The notices were dated March 13, 1994 and July 29, 1994. In these letters, Plaintiff complains of exceedances in Defendant's NPDES permit number TX0004839 which pertains to Defendant's Orange plant. Along with the notice, Plaintiff included a list of BOD, COD, pH, TSS, Copper and Zinc exceedances which had occurred at the Orange plant. The notice also declares that Plaintiff intends to bring suit for all other permit exceedances which had occurred. Under the guidance of *Hercules, Inc.,* the court finds that these notice letters were sufficient to allow Plaintiff to pursue civil penalties for all BOD, COD, pH, TSS, Copper and Zinc violations. However, these notices were insufficient to permit Plaintiff to pursue civil penalties for Defendant's temperature violations.[8] To this date, Plaintiff has neither given notice to Defendant about its temperature exceedances nor included any specific allegations of temperature exceedances in any past notice letter.[9] Because Plaintiff's notice was insufficient under Section 1365, Defendant is entitled to summary judgment on Plaintiff's temperature claims.

---

7. A plaintiff must do more than state that they intend to sue violator for "all violations of permit X." Such notice is insufficient. "The ultimate goal of a citizen suit is to bring the alleged violator into compliance with the nation's environmental laws." *Hercules, Inc.,* 50 F.3d at 1249. A permittee will be less likely to comply with the permit if it is not notified of the parameter which is being violated. Often, separate parameter exceedances may have independent causes and require independent solutions. To allow a violator the opportunity to remedy any shortcoming, the CWA demands that a violator is given notice of its violations.

8. Had the court decided that Plaintiff's notice was sufficient under Section 1365(b), an interesting statutory standing issue would have arisen. The alleged temperature violations occurred during August of 1994, after Plaintiff filed this lawsuit on July 18, 1994. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability,* Exhibit 5. The record contains no evidence of any other temperature exceedances occurring before July 18, 1994.

To have statutory standing, a plaintiff must prove at trial that the defendant was continuously or intermittently violating its permit when the plaintiff filed its complaint. *Carr,* 931 F.2d at 1061. Section 1365(a) requires a plaintiff to prove "a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd.,* 484 U.S. at 56, 108 S.Ct. at 381. Clearly, a violation will not be continuous or intermittent if it occurred wholly in the past; rather, the "continuous or intermittent" language suggests that the violation must be continuous or chronically episodic.

This requirement may ordinarily be satisfied by producing evidence of violations that continue after the date of filing suit or by proving a continuing likelihood of recurrence on the date of filing suit. *Gwaltney of Smithfield, Ltd.,* 844 F.2d at 171–72. Thus, when exceedances occur after the suit is filed, a plaintiff will automatically have standing to pursue civil penalties for those exceedances of that parameter.

Under this framework, if this court held that notice was sufficient for Defendant's temperature exceedances, Plaintiff would have statutory standing for the temperature violations because they occurred after suit was filed. However, such a result seems contrary to the Supreme Court's application of Section 1365 in *Gwaltney.* While the temperature violations occurred after suit was filed, they present a peculiar situation because no temperature violations occurred before suit was filed. These temperature exceedances may constitute nothing more that an isolated and ephemeral occurrence which is neither continuous, chronically episodic nor reasonably likely to occur in the future. To determinatively consider these exceedances as "continuous or intermittent" merely because they occurred after suit was filed would lead to an undesirable result. Under such circumstances, the framework adopted in *Carr* would seem to be a poor fit; nevertheless, because the court holds that Plaintiff's notice was inadequate for the temperature violations, these difficult issues can be avoided.

9. Plaintiff should have issued another notice letter for the temperature violations and could have either amended its complaint or filed an additional action to be consolidated with the original case.

## C. Copper and Zinc Violations

Defendant seeks summary judgment disposing of Plaintiff's claims for copper and zinc exceedances. Defendant contends that it did not in fact violate the NPDES parameters for copper and zinc because those restrictions never went into effect. Rather, Defendant argues that those parameter restrictions were stayed once it contested those restrictions by requesting an evidentiary hearing under 40 C.F.R. § 124.74. Plaintiff concedes in footnote 1 of its brief in opposition to Defendant's motion for summary judgment that the copper and zinc limitations in Defendant's 1989 permit may have been stayed. The Plaintiff, therefore, does not oppose summary judgment with respect to the copper and zinc allegations.

40 C.F.R. § 124.15(b) states, "A final permit decision ... shall become effective 30 days after the service of notice of the decision unless ... an evidentiary hearing is requested under § 124.74 (NPDES permit and RCRA permit terminations)...." 40 C.F.R. § 124.15(b)(2). Under the clear language of this regulation, a parameter restriction will not become effective if a hearing has been requested. *See Puerto Rico Sun Oil Co. v. United States E.P.A.*, 8 F.3d 73, 76 (1st Cir.1993); *Hawaii's Thousand Friends v. City & County of Honolulu*, 821 F.Supp. 1368, 1378 (D.Hawaii 1993).

Because the zinc and copper restrictions were contested by Defendant through the request for an evidentiary hearing, those parameters were not enforceable. Likewise, any exceedance of those parameters would not be subject to a citizen suit. Hence, Defendant is entitled to summary judgment as to the zinc and copper claims.

## D. Statutory Standing

Finally, Defendant argues that Plaintiff does not have statutory standing under the CWA to seek civil penalties for Defendant's past permit violations. Under the Clean Water Act, a "citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of an effluent standard or limitation." 33 U.S.C. § 1365(a). This provision does not permit citizen suits for "wholly past violations." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64, 108 S.Ct. 376, 385, 98 L.Ed.2d 306 (1987). Rather, to establish standing under Section 1365(a), a "plaintiff must 'make a good-faith allegation of continuous or intermittent violation ...'" at the time of the filing of the complaint. *Carr*, 931 F.2d at 1061 (quoting *Gwaltney*, 484 U.S. at 64, 108 S.Ct. at 385). Ultimately, a plaintiff must prove at trial that the defendant was continuously or intermittently violating its permit when the plaintiff filed its complaint. A plaintiff may prove a continuous or intermittent violation in one of two ways:

> (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir.1988) (adopted by the Fifth Circuit in *Carr*, 931 F.2d at 1062). But at the summary judgment stage, a "defendant must prove that the plaintiff's allegations of a continuous or intermittent violation do not raise a genuine issue of material fact." *Carr*, 931 F.2d at 1061.

Normally, an NPDES permit will regulate or limit the discharge of several pollutant types, and each pollutant limitation constitutes a separate parameter of the permit. In deciding whether summary judgment should be granted, Plaintiff contends that when a continuous or intermittent violation of one parameter is established, a court has jurisdiction to consider *all* past parameter violations. On the other hand, Defendant argues that a court must consider a plaintiff's allegations and proof on a parameter by parameter basis. Thus, when a plaintiff seeks judicial relief for permit violations of several parameters, each parameter must be at risk for continuing or intermittent violation.

In support of its argument, Plaintiff directs the court to the language of Section

505(a) which provides that a "citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation .. of an effluent standard or limitation." 33 U.S.C. § 1365(a). And Section 505(f) defines an effluent standard or limitation as "a permit or condition thereof." 33 U.S.C. § 1365(f). However, other courts have held that a citizen's suit should be evaluated on a parameter by parameter basis; consequently, those courts awarded civil penalties only against those parameter violations that were continuing or intermittent at the time suit was brought. *Gwaltney of Smithfield, Ltd.*, 890 F.2d at 698; *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing, Inc.*, 2 F.3d 493, 498–501 (3rd Cir.1993). As the Fourth Circuit stated in *Gwaltney III*, "The entire structure of the Clean Water Act and regulations involves identifying specific pollutants and setting a permit limit for each pollutant of concern. It thus makes sense within this scheme to view each parameter separately for purposes both of determining ongoing violation and of assessing penalties." *Gwaltney of Smithfield, Ltd.*, 890 F.2d at 698. The Third Circuit made a similar finding; however, the Third Circuit applied a somewhat different "modified by-parameter approach." [10] *Natural Resources Defense Council, Inc.*, 2 F.3d at 499. The court held that "[a]lthough the plain language of the statute authorizes a citizen to commence a civil action against a person who is in violation of a 'permit,' it does not follow that such a suit, once commenced, can extend to cover all past as well as present permit violation, including those that are not reasonably likely to recur." *Id.* at 499.

Fifth Circuit caselaw also supports this approach. Although *Sierra Club v. Shell Oil Co.*, 817 F.2d 1169 (5th Cir.1987), preceded the Supreme Court's *Gwaltney* opinion, the basic reasoning of that holding remains valid. In *Sierra Club*, the Fifth Circuit emphasized that the standing issue must be evaluated on

a parameter and point source basis. "[W]hen determining whether a permit-holder has violated an effluent limitation, one must look at each parameter within each point source independently." *Sierra Club*, 817 F.2d at 1173.

In *Gwaltney*, the Supreme Court suggested that citizen suits are supplemental to government action, and "[p]ermitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit." *Gwaltney of Smithfield, Ltd.*, 484 U.S. at 60, 108 S.Ct. at 383. The Supreme Court used the example of a permit violator that enters into a settlement with the Administrator in that the violator would "take some extreme corrective action, such as to install particularly effective but expensive machinery," in exchange for the Administrator's decision not to assess or seek civil penalties. *Id.* at 60, 108 S.Ct. at 383. If a citizen may pursue civil penalties for those same violations which are wholly past violations, "the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably." *Id.* The Supreme Court rejected such a result. In the same vein, if a citizen is permitted to pursue civil penalties for violations neither continuous nor intermittent but wholly in the past, the Administrator's discretion to enforce the CWA would be compromised. Likewise, such a result might subject a company to the proverbial "double whammy."

Indeed, it makes little sense, given the Supreme Court's opinion in *Gwaltney*, to allow a plaintiff to seek penalties for any and every permit exceedance that has occurred so long as one parameter was being violated at the time of filing suit. When a violation, standing alone, would not have provided statutory standing to a plaintiff and jurisdiction to a court, it is difficult to justify levying a penalty for that very violation. Such a holding, when followed to its logical conclusion, would allow a court to levy penalties for any exceedance no matter how random, isolated

---

**10.** Under the modified by-parameter approach, a plaintiff may seek penalties for a parameter violation either "by proving a likelihood of recurring violations of the same parameter; or second, by proving a likelihood that the same inadequately corrected source of trouble will cause

recurring violations of one or more different parameters." *Natural Resources Defense Council, Inc.*, 2 F.3d at 499. The Third Circuit concluded that this test is the same as that proposed in *Gwaltney III*. *See Id.* at 499 n. 2.

or stale. To adopt Plaintiff's position would allow a court to impose penalties on any exceedance occurring within the last five years. *See* 28 U.S.C. § 2462; *Sierra Club v. Chevron U.S.A., Inc.,* 834 F.2d 1517, 1521 (9th Cir.1987). Section 1365(a) was not intended to grant standing in citizen suits to penalize wholly past violations of any particular parameter. Thus, a plaintiff will only have standing to seek civil penalties for those parameters that were at risk of being violated at the time of filing suit, and a court should not impose penalties for other permit violations. *See* 2 WILLIAM H. RODGERS, JR., ENVIRONMENTAL LAW § 4.5, at 32 (Supp.1995) ("Presumably, after a factual investigation many counts of 'alleged violations' will be shown to implicate conduct that is now wholly discontinued. These counts depict behavior that is a wrong, and perhaps even an abominable 'violation' for purposes of Section 309, but they are not a 'violation' for purposes of citizen suits under Section 505. These counts nonetheless must be dismissed.").

Using a parameter based analysis, Plaintiff only has statutory standing to seek civil penalties for Defendant's TSS exceedances. Plaintiff does not have standing to seek civil penalties for the other permit violations.

██ In its complaint and subsequent papers, Plaintiff directs the court's attention to three pH violations. *Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment as to Defendant's Liability,* p. 5. These three exceedances allegedly occurred during December of 1989, June of 1991 and September of 1991. *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, for Dismissal on the Ground of Mootness,* Exhibit 1. The court found no evidence of an alleged pH violation during December of 1989. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to*

*Defendant's Liability,* Exhibits 4–5. Concerning the two exceedances for which there is evidence, however, it is significant that another pH exceedance did not occur after September of 1991. Close to four years have passed since September of 1991 without a pH violation. Defendant offered the affidavits of Dale Durr and Lial Tischler declaring that a future pH violation was not reasonably likely to occur when Plaintiff brought this action.[11] *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment,* Exhibits A and B. In response, Plaintiff offered no evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Therefore, the court finds that the Defendant has demonstrated that the Plaintiff's allegations of a continuous or intermittent violation of pH limits do not raise a genuine issue of material fact, and that Plaintiff does not have statutory standing to bring an action against Defendant for these pH exceedances.

██ Plaintiff also seeks civil penalties against Defendant for 11 COD parameter violations. *Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment as to Defendant's Liability,* p. 5. According to the Defendant's effluent reports, Defendant first exceeded its allowable monthly average for COD in September of 1991. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability,* Exhibits 4–5. In October of 1991, Defendant again exceeded its monthly average and exceeded its permitted daily maximum on October 30, 1991. During the month of November in 1991, Defendant exceeded its maximum daily average. During the next four months (December, January, February and March), Defendant exceeded its maximum daily average for COD every month. *Id.,* Exhibits 4–6. In addition, Defendant had a daily maximum violation on

11. Dale Durr opined,
Regarding pH, Chevron has successfully operated its plant without exceeding its pH limit for over three years. Since the last pH violation, Chevron has continued to upgrade its inspection and maintenance program to effectively eliminate pH exceedances, which were generally due to equipment malfunctions in the past. Chevron's compliance record and its continued efforts demonstrate that it was not reasonably likely for pH exceedances to occur at Chevron's discharge, as of July 14, 1994. *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment,* Exhibit A.

February 4, 1992. *Id.*, Exhibit 6. Finally, Defendant had daily maximum violations on May 27, 1992 and December 5, 1992. *Id.*, Exhibits 4–5. While Defendant had several violations during 1991–92, no further COD violations have been reported since December of 1992. In addition, Defendant offered the affidavits of Dale Durr and Lial Tischler opining that no further COD exceedances were likely to reoccur after July 14, 1994.[12] *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*, Exhibits A and B. In response, Plaintiff has presented no evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Therefore, the court finds that the Defendant has demonstrated that the Plaintiff's allegations of a continuous or intermittent violation of COD limits do not raise a genuine issue of material fact, and that Plaintiff does not have statutory standing to bring an action against Defendant for these COD exceedances.

■ Plaintiff also seeks civil penalties for 6 BOD exceedances. *Plaintiff's Brief in Support of Its Motion for Partial Summary Judgment as to Defendant's Liability*, p. 5. Five of the six BOD exceedances allegedly occurred during June and July of 1992. In June, Defendant violated its daily maximum. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability*, Exhibit 4. In July of 1992, Defendant exceeded its maximum daily average. *Id.* Plaintiff also alleges that Defendant had three daily maximum exceedances during that same month. However, due to the absence of detailed reports, this court is only able to verify one daily maximum exceedance for the month of July. *Id.*, Exhibit 4, July Report. Finally, Plaintiff alleges that Defendant exceeded its maximum daily average for the month of March, 1994. *Id.*, Exhibit 5. No further BOD violations occurred after March, 1994. While Defendant's ex-

perts state that future BOD violations were not likely to occur after July 14, 1994,[13] Plaintiff's expert offered no opinion regarding the possibility of future BOD violations at the time of filing suit. *Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*, Exhibits A and B. Furthermore, Plaintiff has presented no other evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Therefore, the court finds that the Defendant has demonstrated that the Plaintiff's allegations of a continuous or intermittent violation of BOD limits do not raise a genuine issue of material fact, and that Plaintiff does not have statutory standing to bring an action against Defendant for these BOD exceedances.

■ In its complaint, Plaintiff also alleges that Defendant committed monitoring violations. *Plaintiff's Complaint (1:94cv434)*, ¶ 20. Plaintiff seeks civil penalties for a reporting violation which occurred on March 26, 1993. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability*, at 5. Defendant contests that this alleged violation was not, in fact, a violation; rather, Defendant contends that the March 1993 BOD sample was properly analyzed. *Chevron's Response to Plaintiff's Motion for Summary Judgment*, Exhibit A. Furthermore, the record indicates that this violation was not a continuing or chronic problem. In answer, Plaintiff has not proffered evidence to indicate otherwise. Therefore, the court finds that the Defendant has demonstrated that the Plaintiff's allegation of a continuous or intermittent monitoring violation does not raise a genuine issue of material fact, and that Plaintiff does not have statutory standing to seek civil penalties for the monitoring violation.

■ Finally, Plaintiff seeks civil penalties for Defendant's alleged TSS exceedances. Particularly, Plaintiff claims that

---

12. Dale Durr stated,

The measures in place as of July 14, 1994, also provided an increased margin for Chevron to continue to comply with its BOD and COD limits. With these measures, it was not reasonably likely for BOD or COD exceedances to

occur at Chevron's discharge as of July 14, 1994.
*Chevron's Reply to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment*, Exhibit A.

13. *Supra* at n. 12.

Defendant violated the TSS parameter on 62 occasions. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability*, p. 5. The evidence suggests that Defendant exceeded its permit limitations for TSS from July of 1990 up to January of 1994 on a fairly consistent basis. *Plaintiff's Brief in Support of its Motion for Partial Summary Judgment as to Defendant's Liability*, Exhibits 4–5. During this period, Defendant violated both monthly daily average restrictions and daily maximum restrictions. Defendant contends that after January of 1994, many temporary measures were in place to control TSS outflow. Furthermore, in October of 1994, Defendant activated its new wastewater treatment system. Because of the temporary TSS control measures begun in 1994, Defendant contends that no subsequent TSS violations occurred after January of 1994 and that at the time Plaintiff filed suit, there was no real likelihood of further TSS violations. Hence, Defendant argues that the TSS exceedances do not constitute a continuous or intermittent violation under *Gwaltney*.

In response, Plaintiff argues there is a reasonable likelihood that Defendant will exceed its TSS restrictions after July 18, 1994. Plaintiff claims that several of the interim measures in effect at the time of filing suit were insufficient to ensure that there was no real likelihood of future TSS violations on July 18, 1994. Several of these interim measures had been utilized in the past, and Plaintiff contends that Defendant's past TSS violations are illustrative of those measures' ineffectiveness. As additional support, Plaintiff directed this court's attention to a memo released by Chevron on July 19, 1994 which states, "Measures implemented by Chevron will significantly reduce the solids load discharged through the outfall, however, a 3-inch or greater rain event may cause a permit excursion without further solids reduction measures." *Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, for Dismissal on the Ground of Mootness*, Exhibit 14 at 2. Further, Plaintiff offered the affidavit of Bruce Bell. Dr. Bell opines, "Based upon Chevron's estimates and the inherent variation in those estimates, I have concluded

that any rainfall event of two inches or greater had, on July 18, 1994, a reasonable likelihood of resulting in a violation of Chevron's effluent limitations of TSS." *Id.*, Exhibit 18.

Finally, Plaintiff filed a supplemental brief in support of its motion for summary judgment in which Plaintiff asserts that a post-complaint violation of Defendant's NPDES permit occurred on April 10, 1995. Specifically, Plaintiff alleges that Defendant exceeded its permit limitations for TSS and zinc as admitted by Defendant in an April 20, 1995, letter to the EPA. Defendant's letter contends, however, that these violations should be classified as an "upset" under EPA regulations due to heavy rainfall and are, therefore, excusable. The Plaintiff argues that proof of an actual violation subsequent to the filing of the complaint is conclusive proof that the Defendant is "in violation" under § 1365 of the CWA, and that, therefore, summary judgment on the issue of liability against the Defendant is appropriate here. The court might be inclined to agree that the April 10, 1995, TSS exceedance coupled with the earlier pre-complaint TSS violations as shown by Defendants' DMRs, lab reports and correspondence to EPA would entitle Plaintiff to summary judgment on TSS violations liability, but for the fact that the Defendant raises the affirmative defense of "upset" to the April 10 exceedance. Consequently, because a genuine issue of material fact exists regarding whether or not a post-complaint TSS violation occurred, the court declines to grant summary judgment in favor of Plaintiff on Defendant's liability for TSS permit violations. Likewise, because this court finds that the Plaintiff's allegations and summary judgment evidence of a continuous or intermittent violation of TSS limits do raise a genuine issue of material fact, the court also declines to grant summary judgment in Defendant's favor on the TSS exceedances.

## IV. CONCLUSION

The court finds that Plaintiff's claim for injunctive relief is not moot. Plaintiff's claim for civil penalties for Defendant's alleged TSS violations still remains. However, pursuant to the analysis in this memorandum opinion, Defendant is entitled to summary

judgment on Plaintiff's other claims for civil penalties. It is, therefore, ORDERED that Defendant's motion is GRANTED in part and DENIED in part. Furthermore, it is ORDERED that Plaintiff's motion is DE-NIED.